FIL
2ND JUDICIAL DISTRICT COU
Bernalillo Cou
11/18/2024 3:57
KATINA WATS
CLERK OF THE COU
Sofia A Apodaka-Mora

**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**SECOND JUDICIAL DISTRICT COURT**

| | |
|---|---|
| JESSE MARTINEZ, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>  v.<br><br>PRESBYTERIAN HEALTHCARE SERVICES and THOMPSON COBURN LLP,<br><br>         Defendants. | Case No.   D-202-CV-2024-09090<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT

Plaintiff Jesse Martinez ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendants Presbyterian Healthcare Services ("PHS") and Thompson Coburn LLP ("Thompson Coburn" and, with PHS, "Defendants"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and approximately 305,087 other individuals' personally identifying information ("PII") and personal health information ("PHI"), including names, Social Security numbers, dates of birth, medical record numbers, patient account numbers, prescription/treatment information, medical provider information, and health insurance information.

**2.**     PHS is a healthcare system that provides a wide range of medical services to person in New Mexico. Thompson Coburn is a large law firm with several offices across the country. PHS is a client of Thompson Coburn.

**3.**     Between approximately May 28, 2024 and May 29, 2024, an unauthorized third party gained access to Thompson Coburn's network systems and accessed and acquired files containing the PII/PHI of PHS' patients (the Data Breach").

**4.**     Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or sharing PII/PHI with third parties that failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5.     As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and stolen. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately May 28, 2024 and May 29, 2024.

6.     Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violation of the New Mexico Unfair Trade Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Jesse Martinez*

7.     Plaintiff Jesse Martinez is a citizen of New Mexico.

8.     Plaintiff Martinez received healthcare or related services from PHS. As a condition of providing healthcare or related services to Plaintiff Martinez, PHS required Plaintiff Martinez to provide it with his PII/PHI.

9.     Based on representations made by PHS, Plaintiff Martinez believed PHS had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff Martinez provided his PII/PHI to PHS in connection with obtaining healthcare or related services provided by PHS.

10.    Plaintiff Martinez takes great care to protect his PII/PHI. Had Plaintiff Martinez known that PHS does not adequately protect the PII/PHI in its possession, including by sharing PII/PHI with third parties that do not maintain adequate protection for PII/PHI, he would not have obtained healthcare services from PHS or agreed to entrust it with his PII/PHI.

11.    PHS collected, maintained, and shared Plaintiff Martinez's PII/PHI with third parties, including Thompson Coburn. Thompson Coburn in turn stored and maintained Plaintiff Martinez's PII/PHI on its network systems including, at all relevant times, those systems affected in the Data Breach.

12.    Thompson Coburn sent Plaintiff Martinez a letter informing him that his PII/PHI was affected in the Data Breach.

13.    Since the Data Breach occurred, Plaintiff Martinez has experienced a dramatic increase in the number of spam calls and text messages he receives. Prior to the Data Breach, he received approximately 1-2 spam calls per week. Beginning in June and July, 2024, the months immediately following the Data Breach, he has received between 20-40 spam calls per week.

Due to the Data Breach, Plaintiff Martinez has been receiving spam text messages trying to get him to respond and which contain his name; he did not receive similar scam text messages prior to the Data Breach occurring.

14.    In an attempt to mitigate the harms of the Data Breach, Plaintiff Martinez spent several hours contacting major credit bureaus to freeze his credit.

15.    As a result of the Data Breach, Plaintiff Martinez has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft or fraud; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

***Defendant Presbyterian Healthcare Services***

16.    Defendant Presbyterian Healthcare Services is a New Mexico nonprofit corporation with its principal place of business located at 9521 San Mateo Blvd. NE, Albuquerque, NM 87113. It may be served through its registered agent: C T Corporation System, 206 S. Coronado Ave., Espanola, NM 87532.

***Defendant Thompson Coburn LLP***

17.    Defendant Thompson Coburn LLP is a Missouri limited liability partnership with its principal place of business located at 505 N. 7th St., Suite 3500, St. Louis, MO 63101. It may be served through its registered agent: Roman P. Wuller, 505 N. 7th St., Suite 2700, St. Louis, MO 63101.

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has general personal jurisdiction over Defendant Presbyterian Healthcare Services pursuant to NMSA 1978, Section 38-1-16 (1971), because Defendant Presbyterian Healthcare Services is organized under the laws of this State, maintains its principal place of business in this State, and regularly conducts business within this State.

19.    This Court has personal jurisdiction over Defendant Thompson Coburn LLP pursuant to NMSA 1978, Section 38-1-16 (1971), because Defendant Thompson Coburn LLP regularly conducts business in this State, contracts to supply goods or services in this State, has sufficient minimum contacts with this State, and contracts with PHS.

20.    Venue is proper in Bernalillo County pursuant to NMSA 1978, Section § 38-3-1 because PHS's principal place of business is located in Bernalillo County, and because the causes of action herein originated in Bernalillo County.

## FACTUAL ALLEGATIONS

*Overview of Defendants*

21.    PHS consists of "a system of nine hospitals, a multi-specialty medical group with more than 900 providers and a statewide health plan."[1] PHS claims to "serve one in three New Mexicans with healthcare or coverage."[2] It is New Mexico's largest healthcare system.[3]

22.    All of PHS's locations are in New Mexico.[4] PHS states, "Presbyterian Healthcare Services envisions a healthy New Mexico, and we exist to improve the health of the patients, members and communities we serve."[5] PHS is committed to "improving access to health care, behavioral health, health insurance coverage, community supports, healthy food, and opportunities for exercise, and supporting everyone to have the opportunity for good health and

---

[1] *Presbyterian At a Glance*, PHS, https://www.phs.org/about-us (last accessed Nov. 18, 2024).
[2] *Id.*
[3] Presbyterian Healthcare Services, *Community Health Assessments and Implementation Plans Statewide Executive Summary 2023-2025*, PHS, https://onbaseext.phs.org/PEL/DisplayDocument?ContentID=OB_000000023916 (last accessed Nov. 18, 2024).
[4] *See, e.g., Locations: Primary Care & Specialty Clinics*, PHS, https://www.phs.org/locations/clinics (last accessed Nov. 18, 2024); Locations: Urgent Care Clinics, PHS, https://www.phs.org/locations/urgent-care (last accessed Nov. 18, 2024).
[5] *Supporting Community Health in New Mexico*, PHS, https://www.phs.org/community/committed-to-community-health (last accessed Nov. 18, 2024).

well-being in the Land of Enchantment."[6] PHS places a large emphasis on community health initiatives and services in New Mexico.[7]

23.    In the regular course of its business, PHS collects, maintains, and shares the PII/PHI of its current and former patients. PHS required Plaintiff and Class members to provide their PII/PHI to PHS as a condition of receiving healthcare or related services.

24.    PHS states patients have a right to "have confidentiality of your medical records and personal information as further described in the Joint Notice of Privacy Practices handout."[8] It also represents that patients have the right to "have personal privacy to the extent possible and consistent with your care needs."

25.    PHS states patients have a responsibility to, *inter alia*, "provide true and correct information about your personal identity, including your legal name and date of birth," and to "provide complete, accurate and timely medical history and insurance information."[9]

26.    PHS promises members of its health plans that they have the right to "privacy of medical and financial records," and that "[s]uch records shall be kept in accordance with all federal and state laws and regulations."[10] Health plan members also "have a responsibility to provide . . . information that Presbyterian and its providers need in order to care for them."[11]

---

[6] *Id.*
[7] *See generally id.*
[8] *You have the Right...*, PHS (Sept. 2018), https://onbaseext.phs.org/PEL/DisplayDocument?ContentID=PEL_00182934 (last accessed Nov. 18, 2024).
[9] *Id.*
[10] *Presbyterian Health Plan Member Rights & Responsibilities*, PHS, https://www.phs.org/member-rights (last accessed Nov. 18, 2024).
[11] *Id.*

27.     PHS has a Joint Notice of Privacy Practices (the "Privacy Policy"), which it provides to and makes available for patients (including Plaintiff and Class members) to review.[12] The Privacy Policy "describes how medical information about you may be used and disclosed."[13] PHS represents that the Privacy Policy is intended to "help you understand how we protect the privacy of your health information."[14]

28.     PHS states, "Health information about you is contained in our records, but the information in those records belongs to you."[15]

29.     In the Privacy Policy, PHS promises, "Whenever possible, Presbyterian uses or shares health information that doesn't identify you."[16] It claims it has "policies and procedures to protect the privacy of health information that does identify you."[17] PHS represents that "[y]our health information is only used or shared for our business purposes or as otherwise required or allowed by law."[18]

30.     PHS promises, "When a service involving your health information is being performed by a third party, we require a written agreement with them to protect the privacy of your health information."[19]

31.     PHS admits it is "required by law to maintain the privacy of your health information."[20] It further admits it is "required to provide patients . . . with this Notice that

---

[12] *E.g.*, *Joint Notice of Privacy Practices*, PHS (Aug. 1, 2013),
https://onbaseext.phs.org/PEL/DisplayDocument?ContentID=wcmprod1029971 (last accessed Nov. 18, 2024) [hereinafter, the "*Privacy Policy*"].
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

describes our legal duties and privacy practices regarding protected health information."[21] PHS

claims it "must follow the terms of the most current" Privacy Policy."[22]

32.    The Privacy Policy states PHS has "a legal duty to notify you, and you have a

right to know when your protected health information has been inappropriately accessed, used,

or disclosed as a result of a breach."[23]

33.    PHS represents it will only share PII/PHI in certain enumerated circumstances,

including for treatment, payment, and operational purposes.[24] It also states it may share PII/PHI

as part of administrative or legal proceedings.[25] PHS promises it will not share its patients'

PII/PHI in ways not enumerated in the Privacy Policy without written authorization.[26]

34.    Thompson Coburn is a law firm with over 400 attorneys who practice across 50

areas of law.[27] It has offices in Chicago, Southern Illinois, Dallas, New York, Los Angeles, St.

Louis, Washington, D.C., and Birmingham.[28] PHS is a client of Thompson Coburn.

35.    One of Thompson Coburn's practice areas is cybersecurity, privacy, and data

governance.[29] Thompson Coburn is acutely aware that "the consequences of failing to

appropriately mitigate cyber vulnerabilities can be devastating."[30] Thompson Coburn is also well

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *See id.*
[27] *Firm*, THOMPSON COBURN, https://www.thompsoncoburn.com/firm (last accessed Nov. 18, 2024).
[28] *Id.*
[29] *Cybersecurity, Privacy, and Data Governance*, THOMPSON COBURN, https://www.thompsoncoburn.com/services/practices/cybersecurity (last accessed Nov. 18, 2024).
[30] *Id.*

versed in the applicable laws and regulations regarding data security and the protection of PII/PHI.[31]

36.     In the regular course of its business, Thompson Coburn collects, stores, and maintains the PII/PHI of its healthcare-entity clients' patients. PHS shared Plaintiff and Class members' PII/PHI with Tompson Coburn, who then maintained that information on the network systems affected by the Data Breach.

37.     Plaintiff and Class members are current and former patients of PHS whose PII/PHI was shared with Thompson Coburn.

***The Data Breach***

38.     Between approximately May 28, 2024 and May 29, 2024, an unauthorized third party gained access to Thompson Coburn's network system and viewed or stole files containing the PII/PHI of Plaintiff and Class members.[32] Thompson Coburn's investigation revealed that the cybercriminals responsible for the Data Breach accessed and removed files containing the PII/PHI of Plaintiff and Class members, including their "name, Social Security number, date of birth, medical record number, patient account number, prescription/treatment information, clinical information, medical provider information, and health insurance information."[33]

39.     While Thompson Coburn discovered the Data Breach on or about May 29, 2024, Defendants waited until early November, 2024—approximately 5 months later—to begin notifying Plaintiff and Class members that their PII/PHI was in the hands of cybercriminals who intend to misuse that information to, among other things, commit fraud and identity theft.[34]

---

[31] *See id.*
[32] *Thompson Coburn LLP Notice of Data Security Incident*, THOMPSON COBURN, https://tcnotification.com/ (last accessed Nov. 18, 2024).
[33] *Id.*
[34] *See id.*

40.    Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

41.    Recognizing the severity of the harm Plaintiff and Class members now face as a result of the Data Breach, Thompson Coburn warns them to "remain vigilant against incidents of identity theft by reviewing account statements, credit reports, and explanations of benefits for unusual activity and to detect errors."[35]

***Defendants Knew that Criminals Target PII/PHI***

42.    At all relevant times, Defendants knew, or should have known, that the PII/PHI they collect, share, and store was a target for malicious actors. Indeed, PHS tells patients it will inform them if a data breach occurs and Thompson Coburn has a practice related to data breach litigation and cybersecurity.[36] Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized access and theft that Defendants should have anticipated and guarded against.

43.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

---

[35] *Id.*

[36] *E.g.*, *Cybersecurity, Privacy, and Data Governance*, *supra* note 29; *Litigation and Data Breach*, THOMPSON COBURN, https://www.thompsoncoburn.com/services/practices/cybersecurity/litigation-and-data-breach (last accessed Nov. 18, 2024).

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were

caused by flaws in . . . systems either online or in stores."[37]

44.    Cyber criminals seek out PHI at a greater rate than other sources of personal

information. In a 2024 report, the healthcare compliance company Protenus found that there

were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[38] This

is an increase from the 1,138 medical data breaches which exposed approximately 59 million

records that Protenus compiled in 2023.[39]

45.    PII/PHI is a valuable property right.[40] The value of PII/PHI as a commodity is

measurable.[41] "Firms are now able to attain significant market valuations by employing business

models predicated on the successful use of personal data within the existing legal and regulatory

frameworks."[42] American companies are estimated to have spent over $19 billion on acquiring

personal data of consumers in 2018.[43] It is so valuable to identity thieves that once PII has been

---

[37] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[38] *See 2024 Breach Barometer*, PROTENUS 2 (2024), https://protenus.com/hubfs/Breach_Barometer/Latest%20Version/Protenus%20-%20Industry%20Report%20-%20Privacy%20-%20Breach%20Barometer%20-%202024.pdf (last accessed Nov. 18, 2024).

[39] *See id.*

[40] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[41] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[42] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[43] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

46.    As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security Numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

47.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[44] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[45]

48.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[46] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[47]

---

[44] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[45] *Id.*

[46] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[47] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014),

49.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[48] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[49]

50.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[50]

51.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

*Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

52.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility

---

https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[48] Steager, *supra* note 44.

[49] *Id.*

[50] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

accounts, and incur charges and credit in a person's name. [51] [52] Unauthorized access to and theft of PII can cause individuals to face identity theft, monetary losses, privacy violations, reputational damages, and misuse of sensitive health data.[53]

53.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[54]

54.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft. [55]

55.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical

---

[51] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 18, 2024).

[52] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[53] *What is Data Theft?*, PROOFPOINT, https://www.proofpoint.com/us/threat-reference/data-theft (last accessed Nov.18, 2024).

[54] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[55] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 18, 2024).

records that can plague victims' medical and financial lives for years."[56] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[57] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [58] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[59]

56.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

    a.   Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.   Significant bills for medical goods and services neither sought nor received.

    c.   Issues with insurance, co-pays, and insurance caps.

    d.   Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

    e.   Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[56] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[57] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 47.

[58] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 18, 2024).

[59] *Id.*

    f.   As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

    g.   Phantom medical debt collection based on medical billing or other identity information.

    h.   Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[60]

57.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[61]

58.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and the Other Class Members***

59.    Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantial increase in the likelihood of identity theft or fraud; (ii) the compromise, unauthorized access, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required

---

[60] *See* Dixon & Emerson, *supra* note 56.
[61] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

16

to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data

Breach; and (vii) overpayment for services that were received without adequate data security

## CLASS ALLEGATIONS

60.     This action is brought and may be properly maintained as a class action pursuant

to Rule 1-023 NMRA.

61.     Plaintiff brings this action on behalf of himself and all members of the of the

following Class of similarly situated persons:

> All persons whose PII/PHI was accessed by and disclosed to unauthorized
> persons in the Data Breach, including all who were sent a notice of the Data
> Breach.

62.     Excluded from the Class are Presbyterian Healthcare Services, and its affiliates,

parents, subsidiaries, officers, agents, and directors; Thompson Coburn LLP, and its affiliates,

parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over this

matter and the clerks of said judge.

63.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

64.     The members in the Class are so numerous that joinder of each of the Class

members in a single proceeding would be impracticable. Thompson Coburn reported to the

Department of Health and Human Services that approximately 305,088 individuals were affected

in the Data Breach.[62]

---

[62] *Cases Currently Under Investigation*, HHS,
https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Nov. 18, 2024).

65.  Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.  Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b.  Whether Defendants had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c.  Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d.  Whether an implied contract existed between Class members and PHS, providing that PHS would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

f.  Whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

g.  Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

66.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

67.  Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by

18

Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

68.     Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

69.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

70.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71.    Defendants owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in their possession, custody, or control.

72.    Defendants knew, or should have known, the risks of collecting, sharing, and storing Plaintiff's and Class members' PII/PHI, and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted companies storing PII/PHI in recent years.

73.    Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems and prevented the Data Breach from occurring.

74.    Defendants breached these duties by failing to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

75.    Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

76.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

77.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain, share, and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

78.     Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

79.     Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

80.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

81.     It was, or should have been, reasonably foreseeable to Defendants that their failure to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement,

control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

82.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

83.     As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered and will continue to suffer injury including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
***Against PHS Only***

84.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85.     Plaintiff brings this claim individually and on behalf of the Class against PHS only.

22

86.    Plaintiff and Class members gave PHS their PII/PHI in confidence, believing that PHS would protect that information. Plaintiff and Class members would not have provided PHS with this information had they known it would not be adequately protected. PHS's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between PHS and Plaintiff and Class members. In light of this relationship, PHS must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

87.    PHS has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

88.    As a direct and proximate result of PHS's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT

***Against PHS Only***

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Plaintiff brings this claim individually and on behalf of the Class against PHS only.

91.     In connection with receiving healthcare or related services, Plaintiff and Class members entered into implied contracts with PHS.

92.     Pursuant to these implied contracts, Plaintiff and Class members paid money to PHS and provided PHS with their PII/PHI. In exchange, PHS agreed to, among other things, and Plaintiff and Class members and PHS mutually understood that PHS would: (1) provide healthcare or related services to Plaintiff and Class members; (2) use Plaintiff's and Class members' PII/PHI to facilitate providing healthcare services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (4) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations, industry standards, and PHS's representations regarding their security and privacy practices.

93.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and PHS, on the other hand. Had Plaintiff and Class members known that PHS would not adequately protect its patients and former patients' PII/PHI, they would not have sought healthcare services from PHS. The materiality of the protection of PII/PHI is demonstrated by PHS's representations and promises made to Plaintiff and Class members regarding its data security and privacy practices, as described herein.

94.    Plaintiff and Class members performed their obligations under the implied contract when they provided PHS with their PII/PHI and paid for healthcare services (including reasonable and adequate data security) from PHS.

95.    PHS breached its obligations under the implied contracts with Plaintiff and Class members in failing to, and sharing PII/PHI with companies that failed to, implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to, or sharing PII/PHI with companies that failed to, implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and PHS's representations.

96.    PHS's breach of its obligations of the implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

97.    Plaintiff and all other Class members were damaged by PHS's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

98.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99.    This claim is pleaded in the alternative to the breach of implied contract claim.

100.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to PHS for healthcare services, which PHS in turn used to pay for Thompson Coburn's services, and through the provision of their PII/PHI.

101.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate payment and their business operations.

102.    As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

103.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

### COUNT IV
### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT ("UPA")
### NMSA 1978 § 57-12-1 *et seq.*
### *Against PHS Only*

104.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105.    Plaintiff brings this claim individually and on behalf of the Class against PHS only.

106.    The UPA defines an "unfair or deceptive trade practice" as "an act specifically declared unlawful pursuant to the [UPA], a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person." NMSA 1978 § 57-12-2(D).

107.    PHS, Plaintiff, and all members of the class are "person[s]" as defined in NMSA 1978 § 57-12-2(A).

108.    PHS's sale and procurement of healthcare constitutes "trade" or "commerce" as defined in NMSA 1978 § 57-12-2(C).

109.    PHS made representations to Plaintiff and Class members that their information would remain confidential, particularly in its Privacy Policy.

110.    PHS violated the UPA through its failure to adequately safeguard and maintain Plaintiff's and Class members' PII/PHI while representing to Plaintiff and Class members that their PII/PHI would be maintained in a secure manner.

111.    PHS knew or should have known that its data security was inadequate and that Plaintiff's and Class members' PII/PHI would be a target for cybercriminals.

112.    Had Plaintiff and Class members known that PHS would not adequately safeguard their PII/PHI, they would not have provided their PII/PHI to PHS.

113.    As a result of PHS's above-described conduct, Plaintiff and the Class have suffered damages from the disclosure of their information to unauthorized individuals.

114.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of PHS's violations of the UPA. Plaintiff and Class members have

suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

115.    Plaintiff, individually and for each member of the Class, seeks actual damages and attorneys' fees, litigation expenses, and court costs.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and

implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and fraud;

     D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

     E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

     F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 18, 2024

Respectfully submitted,

*/s/ MARK FINE*
Mark Fine
**FINE LAW FIRM**
220 9th St NW
Albuquerque, NM 87102
Tel: 505-494-1646
Fax: 505-242-2716
mark@thefinelawfirm.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff Jesse Martinez*

*\*Pro hac vice forthcoming*